# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

CHARLES RAY CLARK,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C10-3044-PAZ

**MEMORANDUM OPINION AND ORDER**

---

### *Introduction*

    This matter is before the court for judicial review of a decision by an administrative law judge ("ALJ") denying the plaintiff's application for Disability Insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq*. The plaintiff Charles Ray Clark claims the administrative record does not contain substantial evidence to support the ALJ's decision that he is not disabled.

    Clark filed an application for DI benefits on February 22, 2008, alleging a disability onset date of December 15, 2006. His claim was denied initially and on reconsideration. He filed a request for hearing, and a hearing was held before an ALJ on September 17, 2009. Clark was represented by an attorney. Clark and a vocational expert ("VE") testified. On October 21, 2009, the ALJ issued her decision, finding that although Clark had a severe impairment consisting of degenerative disc disease at L5-S1, his impairment did not reach the Listing level of severity. She also found that Clark did not retain the residual functional capacity to perform his past relevant work. However, she found he does have the residual functional capacity to perform other work existing in significant numbers in the national economy. Therefore, she found that Clark is not disabled for purposes of the Social Security Act.

Clark filed a timely Complaint in this court seeking judicial review of the ALJ's decision. On October 14, 2010, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues and the matter is now fully submitted and ready for review.

The court must decide whether the ALJ applied the correct legal standards, and whether her factual findings are supported by substantial evidence based on a review of the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court will consider the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006). The court first will summarize the testimony at the ALJ hearing and the other evidence in the record.

### Hearing Testimony

At the time of the ALJ hearing, Clark was forty-four years old. He was 5'11" tall, and weighed 125 pounds. He had a twelfth grade education, with no post-high school education or training.

Clark's last job was as a mill operator at Winnebago Industries, where he worked for fourteen years. The job required heavy lifting. On December 15, 2006, he injured his back at home while lifting some laundry. He took leave for three or four days, taking muscle relaxers and steroids, and then tried to return to work. To accommodate his injured back, the company limited his lifting and allowed him to stand on rubber mats while working and to sit for ten minutes every hour. The accommodations did not help, and after three or four days, Clark stopped working. Later, he tried to return to work under the guidance of a vocational rehabilitation service, but he continued to suffer severe pain, and he quit after three days.

Clark testified that he suffers from severe back pain and diarrhea. He takes Tramadol and Flexeril for pain, and pantaprazole for stomach problems. He also takes over-the-counter Advil and Tylenol for pain, and Trazodone to help him sleep. He sleeps from fourteen to sixteen hours a day. It is painful for him to sit down, and he can sit for only thirty to sixty minutes before he has to stand up, but if he sits for more than ten or fifteen minutes, he is in great pain when he stands. He can stand for only ten to fifteen minutes. He does no lifting. He can drive a car, although he seldom goes out. He drove seventy miles to the hearing without stopping, but he took Tramadol and Advil before he left home, and he had an ice pack on his back throughout the trip.

On a typical day, Clark helps get his children off to school, and then he tries to do some exercises and physical therapy. He walks, but on a good day he can walk only a couple of blocks. He usually just sits in the sun or watches television. He cannot push a vacuum cleaner or do laundry or the dishes because those activities cause "very bad back pain." He does not do any housecleaning or household repair work. He has no hobbies or activities out of the house. He has trouble walking up and down steps, and has difficulty concentrating.

In a "Function Report" to Social Security prepared by Clark on March 2, 2008, he described his daily activities as follows:

> I get up and get the boys up and supervise them getting ready for school. Once they have left for school, I usually walk on the treadmill and do my exercises which I try to work on throughout the day. At some point in the morning after doing my exercises, I have to lay down for a couple of hours to stretch my back. I watch a little TV, do a little on the computer some days, other than that I really don't do a whole lot. Same goes for the afternoon.

R. 213.  In response to a question about taking care of pets, he stated, "I feed [the dog] and take him out to go to the bathroom."* *Id*.  He also stated that he mows the lawn when his boys are unable to do it, but someone else has to start the mower for him.  *Id*.

Clark will have days when the pain is worse than on other days.  After the injury, he sometimes would have two good days a week, but by the time of the ALJ hearing, he was having only two good days a month.  His testified the pain is worse when the weather is cold, and better when it is hot.  He further testified that he could not work unless he would be permitted to lie down every few hours to relieve the pressure in his back.

The ALJ asked the VE the following hypothetical question:

> The first hypothetical individual is exertionally limited to the performance of no more than light work activity.  This individual could occasionally lift up to 20 pounds but more frequently this, this individual throughout the day would be limited to lifting no more than 10 pounds at a time.  Standing and walking up to six hours in an eight-hour day, sitting up to six hours in an eight-hour day.  This individual would need the ability to be able to change postural position – walking would assist in that.  But to be able to rest a few minutes or so at least every 60 minutes and that would be from standing the majority of the time probably to sitting.  But anyway not sitting over an hour at any point in time and maybe not walking or standing more – over an hour without being given the chance to rest for a few minutes.  Not leaving the work area.  This individual could only occasionally climb, balance, stoop, kneel, crouch, crawl.  This individual would have only occasional exposure to extremes in temperature, specifically cold.  And this individual should never climb ropes, ladders or scaffolds.

---

*At the hearing, Clark explained that when he was filling out the form, the dog was sitting on his lap and he was giving the dog some food, so his wife wrote this answer.  He clarified that he is unable to bend over to put food or water in a dog dish.  R. 72.  However, on a separate form, Clark's wife indicated that Clark gives food and water to the dog during the day.  R. 226.

R. 84. The VE responded that the hypothetical individual could not perform any of Clark's past work, but could perform several light, unskilled jobs, including small parts assembler, toy assembler, and office helper.

The ALJ asked the VE a second hypothetical question:

> The individual is exertionally limited to light work also, the same exertional limitations and actually the same postural limitations [as in hypothetical number one]. [He would need] frequent rest periods throughout the workday that would . . . total . . . at least an hour. . . . [A]fter standing or sitting for a certain period of time [he would need] to leave the work area to take a rest break throughout the day. How would that limitation affect the ability to do the jobs that you just testified that the hypothetical individual number one could perform?

R. 33-34. The VE responded that this individual would not be able to meet the expectations of productivity necessary to hold any job.

The ALJ asked a third hypothetical question, modifying hypothetical number one to add a limitation that the individual would be absent from work two or more times a month. R. 35. The VE responded that this limitation would prevent competitive employment.

### *Summary of Medical Evidence*

On December 19, 2006, Clark was seen by Physician's Assistant James E. McGuire at the Mercy Family Clinic complaining of back pain. He rated his pain as a 6 on a scale of one to ten. Clark reported that two days earlier, he had bent down to pick up a laundry basket and had noticed a twinge of pain in his lower back. He was able to sleep that night, but when he woke up the next morning, the pain was much worse. On examination, he had tenderness to palpation at the right sacroiliac joint, with no spasm of the lumbar muscles and no tenderness or deformity. He had good flexion and extension and normal side-to-side rotation. Straight leg raising on the right produced some pain. McGuire prescribed Naproxen and Flexeril, ice followed by heat and stretching exercises.

During a second visit on December 27, 2006, Clark told McGuire that he was feeling "quite a bit better," and he had not had any pain for the previous three or four days. Clark had no areas of tenderness or spasm, and had full flexion and extension in his back and normal side-to-side rotation. Straight leg raising was negative.

Clark tried to return to work in early January 2007, but noticed increasing pain in his lower back, so on January 8, 2007, he returned to the clinic. He reported to McGuire that he was very stiff when got up in the morning, and he had a hard time bending or twisting. The pain was especially bothersome when he had to bend over forward to put his shoes on. He rated the pain at 5/10. He had tenderness to palpation along the paraspinal muscles in the lumbar spine, but without spinal tenderness or deformity. He had some radiation of pain down into the right sacroiliac joint and sciatic notch areas. He was somewhat limited in his flexion and extension motions because of the pain. McGuire took him off work and told him to use ice, heat, and stretching exercises. He also started Clark on physical therapy, and continued him on Naproxen.

Clark returned to the clinic on January 10, 2007, and stated that he was feeling a little better, although he still had sharp pains if he bent forward too far. He rated his pain as a 4/10 to 5/10. McGuire's assessment was "improving back pain." An x-ray taken of Clark's lumbar spine on January 10, 2007, was negative.

Clark went to physical therapy from January 10 to January 30, 2007. During that time period, he saw McGuire three times. On January 15, he saw McGuire and rated his pain as a 4/10. McGuire's assessment was "improving back pain." On January 19, he saw McGuire again and rated his pain at 3/10. McGuire's assessment was "stable back pain." On January 24, he saw McGuire again and rated his pain at 4/10. Clark reported that the physical therapy was giving him only short-term relief. He stated that prolonged sitting aggravated his pain and caused a numbness and tingling sensation down into his right leg, and he was not sleeping well. McGuire's assessment was "back pain

unchanged." When Clark completed physical therapy on January 30, 2007, he reported that his therapeutic goals were only partially achieved and his expectations were not met.

An MRI taken January 30, 2007, demonstrated L5-S1 degenerative disc disease, with a small posterior disc protrusion and annular tear. On February 22, 2007, Clark saw Darren S. Lovick, M.D., a neurosurgeon. Clark reported pain of 7/10 to 8/10. Dr. Lovick noted, "Straight leg raise sign is positive with pain in the back but not in the leg. Otherwise, strength, sensation, and reflexes in the lower extremities are normal." Dr. Lovick concluded that Clark's condition, as reflected in the MRI, "may cause back pain and it may not," but that it was not "surgical," so an operation would not help. He recommended therapy, then a Medrol Dosepak, and if neither helped, referral to a pain management center. He took Clark off work for two more weeks, with the plan that he would return to work after that.

Clark saw P.A. McGuire on March 7, 2007, and reported his pain as a 5/10. McGuire noted that Clark's lumbar pain remained unchanged, and he directed Clark to resume physical therapy. Clark began physical therapy again on March 9, 2007, and had twenty-five sessions before he was discharged on June 6, 2007.

On March 14, 2007, Clark saw McGuire and rated his pain at a 5/10. McGuire's assessment was "back pain unchanged." On March 28, 2007, Clark returned to see McGuire, reporting his pain as a 7/10. Clark stated his back became "quite sore any time he trie[d] to do any walking or prolonged sitting or standing." He reported that it also was sore the day after each therapy session. McGuire noted that Clark's back was tender to palpation over the lumbar spine around the L3-L4 region, with no paraspinal muscle spasm or tenderness, but Clark had reasonably good flexion, extension, and side-to-side rotation.

Clark saw Dr. Lovick on April 5, 2007, with complaints of continuing back pain. Dr. Lovick ordered an epidural steroid injection. He noted that if the injection did not result in improvement, he would recommend referral to a pain clinic. The injection was administered on April 10, 2007. On April 18, 2007, Clark saw McGuire and reported that

after the injection, he had noticed some improvement, but the pain gradually had returned to its previous level. He stated that he had a pain level of 5/10. On May 2, 2007, Clark again saw McGuire, reporting a pain level of 3/10 or 4/10. McGuire noted "improving back pain." When Clark saw McGuire on May 16, 2007, his pain level was down to 3/10. He reported that he was gradually doing more activities, including mowing the lawn and garden work, and was sleeping fine. A physical examination was normal except for "a little bit of tenderness to palpation in the right paralumbar region extending down towards the right sacroiliac joint."

Clark's status when he was discharged from therapy on June 6, 2007, was "goal attainment sufficient for discharge." In the summary, the therapist stated that during therapy, Clark's pain at rest had decreased from 4.5/10 to 2/10. His pain with activity had reduced from 7.5/10 to 3/10. The therapist observed that lumbar function had increased from 3 to 5. Clark's self-assessed function had increased from 1.3 to 2.4. That same day, Clark reported to McGuire that his pain level had increased to 8/10.

On June 21, 2007, on referral from McGuire, Clark saw Daryll C. Dykes, M.D. Clark reported to Dr. Dykes that he had had right-sided back pain for the past six months. He also had had leg and buttock pain, but that pain had resolved after the epidural injection. Clark told Dr. Dykes that his back pain stayed at around 6/10, but went up to 8/10 at its worst. The pain was aggravated while sitting or taking long car rides, and alleviated by standing, walking, and changing positions. Clark reported that physical therapy had helped. Dr. Dykes examined Clark and found full lower extremity strength and reflexes, normal sensation, and negative straight leg raise, but some pain in his back and down his leg. Dr. Dykes recommended conservative treatment, with physical therapy and continued nonoperative management. He stated that if this did not work, a one-level fusion at L5-S1 should be considered.

Clark returned to see McGuire on June 26, 2007, rating his pain at a 4/10. McGuire's assessment was "back pain unchanged." On July 31, 2007, Clark rated his

pain at 5/10. McGuire noted that Clark was doing more walking, and some swimming, and could do "a little bit of bending." McGuire told Clark to see if his current employer would move him to a job he could perform within his restrictions, and if not, to look for a job elsewhere.

Clark saw McGuire on August 10, August 31, and October 17, 2007, rating his pain at between 4/10 and 6/10 during these visits. McGuire's assessment was that Clark's back pain remained unchanged. On October 29, 2007, Clark returned to Dr. Dykes, who noted that there were no dramatic changes in Clark's symptoms. Dr. Dykes concluded that Clark's back pain was "highly activity related," and Clark did "fairly well" with limitations on his activities. Clark told Dr. Dykes that he was not interested in surgical intervention.

On November 14, 2007, Clark saw McGuire, rating his pain at "5 with movement, otherwise 0." Clark told McGuire that he was feeling about the same. Some days he was more active and could walk without difficulty, and other days he had more stiffness and occasional sharp pains in his lower back. He was "sleeping okay at night." On January 9, 2008, Clark reported to McGuire that his pain was a 5/10, and stated he had more stiffness and aching because of the cold weather. On February 13, 2008, Clark complained to McGuire of anxiety, depression, and difficulty sleeping at night. He reported that his back continued to bother him, especially with prolonged sitting or standing, or any lifting or twisting. Riding in a car bothered his back "quite a bit" if the road had even small bumps. McGuire wrote a note for Clark stating, "Patient has been followed for lumbar degenerative disk disease with an annular tear at L5-S1. He has been unable to work since December of 2006." On March 7 and May 2, 2008, Clark again saw McGuire about his back pain. He rated his pain at 4/10 or 5/10. McGuire noted that Clart continued to be tender to palpation over the lumbar spine, and limited in flexion, extension, and side-to-side rotation due to pain.

On March 13, 2008, McGuire wrote to the state Disability Determination Services Bureau as follows:

> The patient's condition remains essentially unchanged. He continues to rate his pain scale at about a 5. He has very limited lifting or carrying capacity. His current lifting restriction is no more than 10 pounds. Prolonged standing or sitting are also aggravating to his back pain. He cannot tolerate any kind of stooping, climbing, or kneeling. He has no other restrictions other than those that pertain to his back pain. The patient's mental condition is intact. He is able to carry out instructions and maintain attention. He interacts well with coworkers and the public. In fact, he has been recently voted onto the city council in Buffalo Center, Iowa. He does show good use of judgment and is capable of handling his own health benefits.
>
> As far as the patient's prognosis is concerned, it is undetermined at this point what degree of improvement can be expected with his condition. At the present time the neurosurgeon has not recommended surgery for him. However, this is still a possibility for him in the future. There is also still likelihood that he may show significant improvement in time with conservative measures alone.

R. 372.

On May 5, 2008, Chrystalla Daly, D.O. completed a Physical Residual Functional Capacity Assessment form for Clark for DDS. R. 404-11. Dr. Daly had never seen or treated Clark, but completed the form based on her review of his medical records. Dr. Daly determined that Clark could occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds. He could stand and/or walk about six hours in an eight- hour workday, sit for about six hours in an eight-hour workday, and push or pull without limitation other than his weight restriction. She determined that Clark occasionally could climb ramps or stairs, kneel, crouch, and crawl; frequently balance and stoop; but could never climb ladders, ropes, or scaffolds. She found no other limitations. Her rationale for these determinations was as follows:

PA [McGuire] opined in 3-13-08 letter that lifting was restricted to 10# and that prolonged standing/sitting aggravated back pain and that stooping, climbing and kneeling could not be tolerated. This opinion is not given great weight as the clinical findings are minimal. Function report indicates walking improves his pain and bending and prolonged sitting exacerbates pain. Claimant reports he can sit for 30 minutes in a comfortable chair without pain but lifting even a glass of water away from his body hurts. He reports he must lay down for 2 hours after doing stretching exercises in the morning. Somewhat inconsistent with the allegation of pain exacerbation associated with bending is the example that claimant provides food and water to the dog during the day. Children are at school and wife is at work. The assumption is that one must bend to provide food and water to a dog. This inconsistency somewhat erodes credibility. This RFC is written for the impairment of mild [degenerative disc disease] of the lumbar spine.

R. 406.

On June 4, 2008, McGuire wrote to DDS that Clark had "significant back pain that limited his activities. He is rating pain as a 5 and finds that his activities are limited especially with lifting over 10-15 pounds or with prolonged sitting or standing." On June 23, 2008, James D. Wilson, M.D. reviewed Clark's medical records in response to a request by Clark for DDS to reconsider the denial of his claim. Dr. Wilson wrote the following note:

The claimant was previously given an RFC for light work, with additional postural and environmental limitations, and please see the prior review dated 5-5-08 for information through that date. The claimant has indicated that there has been no change or worsening of his condition since the prior review. He has returned to his doctor for additional medical care, and his updated exams have not revealed any worsening. The previous assessment appears to be appropriate, and has been affirmed as written.

R. 424.

Clark saw McGuire on July 7 and September 8, 2008. His back pain continued without significant change, but during the July visit, he also complained of abdominal pain. He started taking omeprazole to treat the abdominal pain, but the pain seemed to resolve itself, so he stopped. On December 31, 2008, and again on March 12, 2009, Clark indicated to McGuire that his back pain had increased to a 7/10. Clark also complained of problems sleeping due to stomach discomfort. McGuire's assessment was "back pain unchanged," but in March, he added gastroesophageal reflux disease and insomnia to the assessment. On April 8, 2009, Clark complained to McGuire of continued problems with his stomach, including explosive bouts of diarrhea. He also stated that he had noticed increased back pain, which he rated at 7.10. McGuire scheduled Clark for a repeat epidural injection, which was administrated on April 13, 2009. A medical note dated April 29, 2009, stated, "Has tried omeprazol 40 mg daily from 4-21-09 to 4-29-09. Stomach pain back. Not feeling good on this."

A functional capacity evaluation of Clark was performed on January 16, 2009, at Mercy Rehabilitation Services. Tests demonstrated that he could lift up to fifteen pounds occasionally and nine pounds frequently. He could bend/stoop occasionally, but only partially, and occasionally could squat, climb steps, walk, reach above shoulder level, and kneel. He could never crawl, climb a ladder, or bend/twist. The evaluator recommended Clark for jobs with physical requirements up to and including "Sedentary-Light." A "facility work site assessment" of Clark was begun in February 2009, to determine his vocational strengths, needs, and employability, but the assessment was not completed because Clark was unable to attend all of the scheduled days "due to extreme back pain." During the assessment, Clark complained of pain in his right knee of 5/10 to 8/10, and pain in his trunk of 10/10. The short-term recommendation was that he continue under a physician's care.

On March 27, 2009, Michelle Krefft, a vocational rehabilitation counselor, concluded that unless Clark were able to get his pain under control, there were no jobs in the current market he would be able to perform.

### *Summary of ALJ's Decision*

The ALJ found that Clark has not engaged in substantial gainful activity since December 15, 2006, his alleged disability onset date. She found him to have the severe impairment of degenerative disc disease at L5-S1, but she further found that his impairment does not equal one of the listed impairments in the regulations. She further found that his claimed mental impairment is not severe.

The ALJ found as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has a residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant will need to be able to change postural positions; for example, walking would assist in that. The claimant would need to be able to rest for a few minutes at least every sixty minutes from standing. The claimant would not be sitting over one hour and not walking/standing over one hour without having the opportunity to rest for a few minutes. The claimant would not need to leave the work area to rest. The claimant can only occasionally climb, balance, stoop, kneel, crouch, or crawl. The claimant should have only occasional exposure to extremes in temperature, specifically the cold. The claimant should never climb ropes, ladders, or scaffolds.

R. 7-8. That ALJ stated that in making this finding, she considered all of Clark's symptoms to the extent they reasonably could be accepted as consistent with the objective medical evidence.

The ALJ found, "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically,

the medical findings do not support the existence of limitations greater than the above listed residual functional capacity." R. 8. The ALJ further found as follows:

> The claimant has been treated for back pain. The results of a lumbar MRI performed in January 2007 showed decreased disc height and desiccation at L5-S1 with small midline posterior disc protrusion with a tiny annular tear. There was no significant stenosis. An epidural steroid injection was administered in April 2007, which was partially successful in removing pain. The claimant used Flexeril and Advil in conjunction with ice and stretching to relieve pain. In June 2007, conservative treatment was recommended. . . . A follow up examination in January 2008 indicated the claimant had no spasms and a straight leg-raising test was negative. Although the claimant exhibited some painful range of motion, no palpable tenderness was noted. In April 2009, the claimant requested an additional epidural steroid injection. Treatment records noted he had not had an injection in over a year prior to this request. In addition, claimant reported improved sleep since he started taking Trazodone at bedtime. . . . The claimant continued to complain of back pain, especially with any kind of bending, twisting, or prolonged sitting or standing. . . . However, the objective medical findings do not support the severity of the alleged symptoms. The claimant has been treated conservatively and has not undergone invasive procedures such as surgery. Despite his allegations of severe pain, the claimant reportedly took only Advil or Tylenol in January 2008. . . .
>
> The record reflects the opinion of James E. McGuire, PA-C. Mr. McGuire opined that he claimant was limited to lifting no more than ten pounds and could not tolerate any kind of stooping, climbing, or kneeling. However, Mr. McGuire also noted that despite extensive testing and thorough evaluations by multiple specialists, only conservative treatment had been recommended. . . . As pointed out in 20 CFR 404.1513 and 416.913, reports about an impairment must come from acceptable medical sources. Acceptable medical sources are identified as licensed physicians, licensed osteopaths, licensed or certified psychologists, licensed optometrists, and persons

authorized to send summaries of medical records of a hospital, clinic, sanitarium, medical institution or health care facility. Subsection (e) indicates that information from other sources might help in understanding how an impairment affects an individual's ability to work. "Other sources" include, <u>inter alia</u>, practitioners such as naturopaths, chiropractors, and the like. Physician's assistants are not identified as acceptable medical sources, but "other" sources, and the undersigned must rely on the opinions of the treating and consulting medical specialists who examined the claimant. Moreover, the objective medical evidence does not support the severity of the claimant's allegations and is inconsistent with the limitations proposed by Mr. McGuire.

R. 8-9 (citations to exhibits omitted).

The ALJ also found Clark's statements regarding the intensity persistence, and limiting effects of his symptoms were not fully credible. She noted:

Despite the claimant's allegations of severe pain, the objective medical evidence does not support limitations greater than those detailed in the residual functional capacity above. The claimant received conservative treatment and extensive testing did not indicate surgical intervention was necessary. The claimant experiences some symptoms and limitations; however, the record does not fully support the severity of the claimant's allegations. . . . In sum, the above residual functional capacity assessment is supported by the objective medical evidence contained in the record. Treatment notes in the record do not sustain the claimant's allegations of disabling pain. The State agency opinions are internally consistent and consistent with the evidence as a whole. The credibility of the claimant's allegations is weakened by a lack of corroborating objective medical evidence. The claimant does experience some levels of pain and limitations, but only to the extent described in the residual functional capacity above.

R. 10.

Based on her findings, the ALJ concluded that Clark "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." R. 12. She therefore concluded that Clark is not disabled.

### *Disability Determinations and the Burden of Proof*

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(I).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not

significantly limit the claimant's physical or mental ability to do basic work activities."
*Kirby*, 500 F.3d at 708 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987); *id.* at 158, 107 S. Ct. at 2300 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the

physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant

numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *See Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page*, 484 F.3d at 1042 (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion.") (quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at

1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1997)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort, or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

739 F.2d 1320, 1322 (8th Cir. 1984); a*ccord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

*Discussion*

Clark argues the ALJ incorrectly gave "great weight to the non examining expert sources when [these sources] should have been given little weight." Doc. No. 9, pp. 5-7. The "non-examining" sources Clark refers to are Dr. Daly and Dr. Wilson, both of whom gave opinions about Clark's impairment after conducting paper reviews of the medical records. Clark claims the Commissioner has failed to point to anything in the ALJ's decision to show that she considered the appropriate factors in weighing these opinions. He argues that based on the record, these opinions should have been given less weight than the opinions of P.A. McGuire, who treated Clark regularly for more than two years, or Michelle Krefft, the vocational rehabilitation counselor who saw Clark in March 2009.

Because Dr. Daly and Dr. Wilson are medical doctors, they are "acceptable" medical sources. As acceptable medical sources, they can provide medical opinions and provide evidence to establish the existence of a medically determinable impairment. Although Dr. Daly and Dr. Wilson are acceptable medical sources, they were not "treating" sources. Therefore, their opinions cannot, by themselves, constitute substantial evidence to deny Clark's claim. "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). McGuire and Krefft are "other" medical sources. They are not "acceptable" medical sources. Because of this, they cannot provide medical opinions, and their testimony cannot establish the existence of an impairment, although it can be used to understand how an impairment might affect an individual's ability to work.

The court described this system in *Sloan v. Astrue*, 499 F.3d 883 (8th Cir. 2007):

> On August 9, 2006, the SSA issued Social Security Ruling (SSR) 06-3p, 71 Fed.Reg. 45,593 (Aug. 9, 2006). The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources."

Social Security separates information sources into two main groups: acceptable medical sources and other sources. It then divides other sources into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007).

Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, id., (2) only acceptable medical sources can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007), and (3) only acceptable medical sources can be considered treating sources, 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

Other sources: Medical sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. Non-medical sources include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."

*Id.* at 888.

Here, if the ALJ had relied solely on the opinions of Dr. Daly and Dr. Wilson to deny Clark's claim, her ruling would not have been supported by substantial evidence. However, that is not the case. The ALJ relied on additional evidence to support her

findings. Clark has never taken strong medication to treat his pain. The ALJ noted that despite Clark's allegations of severe pain, there is little objective medical evidence in the record to support his claimed limitations. The treatment notes over the years show that while Clark had been in pain since December 2006, with few exceptions the pain has not been disabling. Although an MRI of Clark's spine showed decreased disc height and desiccation at L5-S1, with a small midline posterior disc protrusion and a tiny annular tear, a neurosurgeon concluded that this "may cause back pain and it may not," and recommended no surgery. Although one doctor commented that surgery might have to be "considered" in the future if conservative treatment did not work, surgery has never been recommended. In fact, P.A. McGuire, as well as all of the doctors who have examined or treated Clark, have recommended "conservative" treatment.

Clark also argues the ALJ failed to develop the record adequately because she disregarded the opinions of McGuire and Krefft and relied on the non-examining physicians Dr. Daly and Dr. Wilson. The ALJ was not required to develop the record further unless she was unable to make a determination of disability from the evidence already in the record. Because she was able to make this determination, she was not required to develop the record further. Clark contends the ALJ was remiss in not seeking out other evidence in support of a finding of disability. The ALJ did not have such a duty. *See Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005).

Clark next argues the ALJ failed to consider all of the evidence in the record, including Clark's attempts to work, the evidence offered by his wife, the work evaluations, and the frequency of his treatment. The court disagrees. The ALJ considered all such evidence. Clark also argues the ALJ failed to give appropriate weight to his persistent efforts to relieve his chronic back pain. This argument also is not supported by the record.

The court finds Clark's remaining argument to be without merit.

Because the court finds substantial evidence supports the Commissioner's decision that Clark is not disabled, the Commissioner's decision is **affirmed**, and judgment will be entered in his favor and against Clark.

**IT IS SO ORDERED.**

**DATED** this 14th day of March, 2011.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT